# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| ESAU ROBINSON, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.: 2:12-CV-108-TLS |
| LAKE MINNEHAHA OWNER'S ASSOCIATION | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Esau Robinson, alleges that his former employer, Lake Minnehaha Owner's Association, discriminated against him on the basis of race. The Defendant maintains that no genuine issue of material fact exists and that summary judgment should be rendered in its favor. For the reasons set forth in this Opinion and Order, the Court finds that no reasonable jury could find in the Plaintiff's favor and that the Defendant is entitled to judgment as a matter of law.

## BACKGROUND

From 2006 to 2011, the Plaintiff, a 78-year-old African-American, was employed as a maintenance department supervisor at Yogi Bear's Jellystone Park Camp Resort (operated by the Defendant) in Portage, Indiana. The maintenance department, which generally consists of less than 10 employees—both regular (year-round) and temporary (seasonal)—is available 24 hours per day. Therefore, its employees typically work one of three shifts: day (8 AM-4 PM), afternoon (4 PM-12 AM), or evening (12 AM-8 AM). The Plaintiff worked the day shift and was

considered a "regular full-time" employee.[1] Although the Plaintiff was the only African-American in the maintenance department, the Defendant employed other African-Americans, including one supervisor, in other departments. Outside of his employment, the Plaintiff participated in several bowling leagues.

Upon his hiring in 2006, the Plaintiff served alongside his "co-supervisor" in the maintenance department, Alan Harford, who had been employed by the Defendant, almost continuously, since 2000. According to Harford, the Plaintiff was hired by the park manager, Carolyn Julovich, because "[s]he didn't feel like [Harford] was ready just to take [the supervisor position] all on [himself], and she was going to bring [the Plaintiff] in as a co-supervisor." (Harford Dep. 7, ECF No. 40-1.) Aside from his supervisory duties, the Plaintiff performed the same tasks as non-supervisory maintenance employees.

During Julovich's tenure as park manager, the Defendant's Board of Directors sought to alter the work schedules for the maintenance department's supervisors, whereby one supervisor worked the day shift, and the other worked the afternoon shift. According to the Plaintiff, Julovich objected to the proposal because plumbing and electrical work cannot be performed at night. (*See* Pl's Dep. 17, ECF No. 40-5 ("[Plaintiff: The Board] had talked to her [about the proposal], and she told them that . . . that wouldn't work . . . they kept on her about that . . . [but she objected because] we had electricity [and] plumbing [work] and stuff like that").) As a result, both the Plaintiff and Harford continued to work the day shift.

---

[1]According to the Defendant's Employee and Employment Manual, regular full-time employees "are those who are not in a temporary or introductory status and who are regularly scheduled to work a full-time schedule." Full-time employees are generally eligible for an employee benefit package. (Ex. F at 5, ECF No. 40-6.) Temporary employees, on the other hand, are those "who are hired as interim replacements, to temporarily supplement the work force, or to assist in the completion of a specific project." Temporary employees are ineligible for an employee benefit package. (*Id.*)

In early 2010, Julovich resigned. This led to the park manager position being divided among three individuals, including Harford, who was elevated to the new position of maintenance manager. As maintenance manager, Harford had supervisory authority over all employees in the maintenance and grounds departments. After Harford's promotion, the Plaintiff retained his supervisor position, remained the only maintenance employee—aside from Harford—with supervisory authority, and continued to earn a higher hourly wage than non-supervisory maintenance employees.

In late 2010, the Defendant's Board of Directors met to discuss the 2011 budget, and determined that cuts were necessary. Fred Darlinger, a Board member at the time, testified that the Defendant was $86,000 in debt. (Darlinger Dep. 36, ECF No. 40-3.) Around this time, Darlinger met with the Plaintiff to discuss his employment.[2] Darlinger asked the Plaintiff how long he intended to work. The Plaintiff responded that he was in "good health" and that he intended to work "as long as [he] felt like it." (Pl's Dep. 58.)

On January 8, 2011, the Board approved a new budget. (Ex. 7 at 5, ECF No. 37-7). Debbie Podgorski, the operations manager, testified that the Defendant was forced "to cut [its] budget in all departments, and each department either lost someone or . . . wouldn't have someone hired back or their hours would be reduced as a whole." (Podgorski Dep. 17, ECF No. 40-4.) Podgorski added that budget cuts were "across the board." (*Id*. at 18.) The Board's redacted meeting minutes show that work hours for all supervisors were reduced. (Ex. 7 at 7 ("[t]he hours for the supervisors will be down to 30 [hours per week].").) Soon thereafter, the

---

[2]The Plaintiff testified that Darlinger met with all employees individually. (*See* Pl's Dep. 58 ("[Plaintiff's Counsel:] You said [Darlinger] had a meeting with all of the employees individually? [Plaintiff:] Individually, yeah. You know that's what [Darlinger] said.").)

Plaintiff was notified by Harford and Podgorski that his hours were being reduced from 40 to 30 hours per week. The Plaintiff claims that no reason was provided for the reduction, while Harford and Podgorski testified that the Plaintiff was informed of the Defendant's budgetary constraints. After the reduction, the Plaintiff retained his supervisor position, his status as a "regular full-time" employee, and his hourly wage of $12.40. The Plaintiff also occasionally worked more than 30 hours per week.

On or about July 9, 2011, the Defendant hired Ralph Cherry, a former employee of the Defendant, to work as a temporary maintenance employee (i.e., a seasonal employee). According to Darlinger, the maintenance department requires more employees in the summer season "because that's when the most [maintenance] work is performed." (Darlinger Dep. 28.) Cherry described the circumstances leading to his re-hiring:

> Cindy Doppler, I believe her name was . . . She was on the board of directors . . . I [saw] her either at Walgreens or someplace, and she says, "Are you busy?" I says, "No. I'm just looking for something to do right now." And she says that they could use my help down at Yogi Bear.

(Cherry Dep. 9, ECF No. 40-2.) Cherry (who is white) was formerly employed by the Defendant as a "yard foreman," a position which, according to Cherry, entailed similar duties to the maintenance manager position. (*Id.* at 18.) Upon his return, Cherry performed "general maintenance," (*Id.* at 13; Harford Dep. 18), worked the day shift, and earned $8–10 per hour. During his employment, which concluded in fall 2011, his hours fluctuated between 30 and 40 hours per week. Cherry considered Harford to be his only direct supervisor.

On July 28, 2011, the Plaintiff had another meeting, this time with Darlinger and Harford. They informed him that, moving forward, they needed a supervisor available for a portion of the afternoon shift. They offered him a "special shift" of 2 PM to 8 PM. (Podgorski

4

Dep. 23.) Harford described the meeting as follows:

> [We] let him know that the board of directors had decided they want a manager and supervisor on different shifts . . . He said he wouldn't do it because he did his bowling [during the afternoon shift], and I told him . . . "We'd give you to the end of the day to think about it." And I asked him at the end of the day if he wanted to do it, and he said he wasn't going to give up his bowling, and he turned in his keys, and he left.

(Harford Dep. 23.) When asked if the Plaintiff used the words, "I quit," Harford said "No. [The Plaintiff] said 'If that's the way it's got to be, that's the way it's got to be.'" (*Id*.) According to Darlinger, Harford notified the Board that the Plaintiff voluntarily resigned. (Darlinger Dep. 29.)

The Plaintiff offered a contrasting version of the events:

> [On July 28] I went into [Harford's] office—[Harford] and [Darlinger were] in there . . . [Harford] said . . . "[we're] changing your shift." And I told him at that time that I won't [work] nights. [Darlinger] said, "Well, why don't you think about it." I went out and worked all day . . . when I come in getting ready to leave, [Harford] said, 'Did you think about it?" I said, " I won't work evenings." Then he said, "Well, I have to let you go," and I said, "Okay."

(Pl.'s Dep. 52.)

Darlinger and Harford testified that if the Plaintiff declined to work the special shift, he would have faced a demotion and a reduction in his hourly wage. (Harford Dep. 24; Darlinger Dep. 31–32). According to the testimony of Harford and Podgorski, the option to remain on the day shift was not communicated to the Plaintiff.

Following the Plaintiff's termination of employment, the Defendant hired Jason Woolsey to fill the supervisor position. Woolsey worked the afternoon shift of 4 PM to 12 AM. Woolsey was later replaced by Richard Jacobs, who also worked the afternoon shift. Both Woolsey and Jacobs are white.

## PROCEDURAL BACKGROUND

On August 8, 2011, the Plaintiff filed a Charge of Discrimination against the Defendant with the Gary Human Rights Commission (GHRC) and the Equal Employment Opportunity Commission (EEOC). The Plaintiff marked the box for race discrimination as the basis for his Charge. On December 13, 2011, the EEOC issued the Plaintiff a Dismissal and Notice of Rights. On March 12, 2012, the Plaintiff filed a Complaint against the Defendant "pursuant to Title VII of the Civil Rights Act of 1964 ('Title VII'), 42 U.S.C. § 2000e, 42 U.S.C. § 1981 and relevant state law." (Compl. 2, ECF No. 1.) The Plaintiff alleged Title VII claims for a hostile work environment, race discrimination, and retaliation (embedded in Count 1); intentional infliction of emotional distress (Count 2); and negligent infliction of emotional distress (Count 3).

On August 1, 2012, the Defendant filed a Motion to Partially Dismiss the Plaintiff's Complaint [ECF No. 9], seeking dismissal of the Plaintiff's claims for a hostile work environment and retaliation on grounds that they were not within the scope of the Plaintiff's Charge of Discrimination, nor supported by the facts set forth in the Complaint. The Defendant also sought dismissal of Counts 2 and 3. On December 12, 2012, the Court issued an Opinion and Order [ECF No. 15] granting in part and rendering moot in part the Defendant's Motion to Partially Dismiss. As a result, only the Plaintiff's race discrimination claim remained.

On December 29, 2014, the Defendant filed a Motion for Summary Judgment [ECF No. 35], along with a Brief in Support of the Motion [ECF No. 36]. On January 26, 2015, the Plaintiff filed a Response [ECF No. 40]; and on February 11, 2015, the Defendant filed a Reply [ECF No. 42]. This matter is now fully briefed and ripe for ruling.

# SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## ANALYSIS

The Plaintiff asserts that the Defendant terminated his employment in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Likewise, § 1981 prohibits discrimination on the basis of race in the making, enforcing, and terminating of contracts, including employment contracts. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975). The relevant analysis is the same for both Title VII and § 1981. *See Scaife v. Cook Cnty.*, 446 F.3d 735, 739 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

Discrimination may be proven under either the direct or indirect method of proof. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Two types of evidence are permissible under the direct method: (1) evidence that would prove the fact in question without reliance on inference or presumption (direct evidence); and (2) evidence that allows a fact finder to infer intentional discrimination by the decision maker (circumstantial evidence). *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 737); *see also Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006) (clarifying that circumstantial evidence need not have a mosaic-like character to preclude summary judgment but need only allow the trier of fact to infer intentional discrimination by the decision maker).

Under the indirect method, which provides a means of evaluating indirect evidence of discrimination at the summary judgment stage, *Oest v. Ill. Dept. of Corrs.*, 240 F.3d 605, 612 (7th Cir. 2001), the Plaintiff must establish a prima facie case of discrimination by showing that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff," *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006). If the prima facie case is established, it triggers a presumption of discrimination and the burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Burks*, 464 F.3d at 751. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Burks*, 464 F.3d at 751.

Here, the Plaintiff attempts to establish race discrimination under both the direct and indirect methods. For the sake of simplicity, the Court's analysis for both methods is consolidated.

### A.     Adverse Employment Action

For an employment decision to be actionable, under either the direct or indirect method, it must have resulted in a material harm that alters the "terms, conditions, or privileges of [the plaintiff's] employment." 42 U.S.C. § 2000e-2(a)(1); *see Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234–35 (7th Cir. 2014). The Defendant argues that summary judgment is appropriate

9

because the Plaintiff voluntarily resigned from his employment, and therefore, he cannot show a materially adverse employment action. *See Andrews*, 743 F.3d at 235 ("[i]n the absence of circumstances suggesting a constructive discharge, an employee who voluntarily resigns cannot be said to have experienced an adverse employment action."). The Plaintiff contends, however, that he was involuntarily terminated by the Defendant; and regardless of the nature of his termination, he also suffered a materially adverse employment action when his hours were reduced.

Generally, an employment action that causes a reduction in a plaintiff's compensation qualifies as an adverse employment action. *See Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 235 (7th Cir. 2004); *see also Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("In some cases, for example when an employee is fired, or suffers a reduction in benefits or pay, it is clear that an employee has been the victim of an adverse employment action."). As such, "a reduction in hours could be an adverse action giving rise to liability." *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010); *see also O'Neal v. City of Chi.*, 392 F.3d 909, 911–12 (7th Cir. 2004). Here, it is undisputed that the Plaintiff's hours were reduced from 40 to 30 hours per week, without a corresponding increase in pay. The record shows that the Plaintiff worked a reduced schedule for a period lasting several months, resulting in a reduction in pay of roughly $124 in pre-tax wages per week ($12.40 x 10 (hours)). Because the Plaintiff's reduction in hours equates to a material reduction in pay, the Plaintiff has suffered an adverse employment action. *See Duncan v. Thorek Mem'l Hosp.*, 784 F. Supp. 2d 910, 919 (N.D. Ill. 2011) (finding that a plaintiff suffered an adverse employment action when her hours were reduced and as a result, she lost $930.35 in total wages and four-and-a-half vacation hours); *Tropp v. Ingalls Mem'l*

*Hosp.*, No. 6-C-414, 2007 WL 869555, at *10 (N.D. Ill. Mar. 21, 2007) (finding that a "reduction in [the plaintiff's work] hours caused a reduction in her pension, paid sick days, and paid vacation days[,]" and therefore, constituted an adverse employment action).

In addition to the Plaintiff's reduction in hours, a factual dispute exists as to whether the Plaintiff voluntarily resigned or was involuntarily terminated from his employment. *See Andrews*, 742 F.3d at 235 ("Termination of employment is obviously a significant change in employment status and thus a materially adverse employment action.") (citation and quotation marks omitted). According to the Plaintiff, after informing Harford of his refusal to work in the evening, Harford stated, "[w]ell, I have to let you go." (Pl.'s Dep. 52.) The Plaintiff's contention is supported by evidence that the option to remain on the day shift was not communicated to the Plaintiff. (*See* Harford Dep. 24; Podgorski Dep. 23–24.) Even though Darlinger and Harford both testified that the Plaintiff voluntarily resigned his employment, the Court cannot, at this stage of the litigation, resolve what appears to be a "he-said-she-said" scenario. *See Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 340 (7th Cir. 2001). Accordingly, when viewing the evidence in a light most favorable to the non-movant, the Plaintiff has submitted sufficient evidence to show that he suffered an adverse employment action.[3]

---

[3]The parties' briefing also includes arguments related to the constructive discharge doctrine. To establish a constructive discharge, a plaintiff "must demonstrate a work environment that is even more egregious than that needed for a hostile work environment such that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401–02 (7th Cir. 2010) (citation and internal quotation marks omitted). However, because the Plaintiff has submitted sufficient evidence to show he was involuntarily terminated, the Court need not address this issue.

**B.  Discriminatory Intent**

Under both the direct and indirect methods of proof, a plaintiff may only avoid summary judgment if he can also show that an adverse employment action was guided by an improper motive. *Coleman*, 667 F.3d at 845. Here, the Plaintiff presents no direct evidence of discriminatory intent on the part of the Defendant. The relevant decision makers—Darlinger, Harford, and Podgorski—all testified that race played no factor in their employment decisions related to the Plaintiff. The record also contains no evidence of race-based harassment or derogatory remarks being directed at the Plaintiff or any other employee. Nonetheless, the Plaintiff claims that under the direct method of proof, his "strongest evidence . . . is [the Defendant's] pretextual reasons for cutting his hours and terminating him." (Pl's Br. 11, ECF No. 40.) The Plaintiff submits the same evidence to prove discrimination under the indirect method.

**1.  *Pretext***

In the context of employment discrimination cases, a pretext is a dishonest explanation for the adverse employment action. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). To show that the defendant's proffered reason is pretextual, the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007). If the defendant honestly believed the reasons it gave, the plaintiff's effort to show pretext fails, regardless of whether that reason was "foolish, trivial or baseless."

*Id.*; *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action."). Further, the plaintiff cannot establish pretext merely by showing that defendant's decision to terminate him was "mistaken" or "ill considered." *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

After a thorough review of the record, the Court cannot find sufficient evidence to suggest that the Defendant's adverse employment actions were racially motivated. As to the Plaintiff's reduction in hours, the Defendant has proffered a legitimate and non-discriminatory reason for the reduction: budget constraints. The Defendant's financial woes and resulting cuts during the relevant time period are corroborated by the testimony of Darlinger, Harford, and Podgorski. Their combined testimony indicates that the Defendant was $86,000 in debt, and as a result, enacted "across the board" budget cuts. (Podgorski Dep. 17-18 (The Defendant was forced "to cut [its] budget in all departments, and each department either lost someone or . . . wouldn't have someone hired back or their hours would be reduced as a whole.").) Such cuts are further corroborated by the redacted meeting minutes, which show that all supervisor hours were reduced following approval of a 2011 budget.

The Plaintiff attempts to show pretext—or in other words, show that the Defendant's proffered reason of budgetary constraints was a lie to cover up a true motivation of racial animus—by pointing primarily to the facts and circumstances surrounding Cherry's employment. In particular, the Plaintiff claims that racial discrimination may be inferred from

13

the following: (1) the Plaintiff maintained a solid employment record, absent of any reprimands or complaints; (2) Cherry was hired in the maintenance department after the Plaintiff's reduction in hours; (3) Cherry worked 30 to 40 hours per week; and (4) Cherry is white. The Plaintiff further contends that the Defendant offered "undefined budgetary reasons" for the hours reduction and presented inconsistent evidence as to who made the decision. (Pl's Br. 11.)

As a preliminary matter, while an argument can be made that Cherry is "similarly-situated" to the Plaintiff, *see Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (stating that the plaintiff must show that "the members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment"), the more apt comparison group is the Defendant's group of supervisors—*all* ten of whom (including eight white supervisors) saw their hours reduced to 30 hours per week. (*See* Ex. 7 at 7.) But notwithstanding, the hiring of Cherry casts limited doubt on the truthfulness of the Defendant's rationale. According to Darlinger, the maintenance department employs more employees in the summer season "because that's when the most [maintenance] work is performed." (Darlinger Dep. 28.) Cherry's employment began in the summer season, when Doppler told him the Defendant "could use [his] help down at Yogi Bear," (Cherry Dep. 9), and ended in the Fall, strongly suggesting that Cherry was, in fact, hired to fill the Defendant's need for temporary labor during its busy season. And while Cherry testified to "sometimes" working 40 hours per week,[4] (Cherry Dep. 19), Harford explained that Cherry likely worked additional hours because it was "a money issue" (i.e., Cherry was earning between $2.40–$4.40 less per

---

[4]The Court notes that the Plaintiff also occasionally worked more than 30 hours per week during this time period. (*See* Plaintiff's Dep. 24 ("[Plaintiff's Counsel:] "What about after January 2011? Were there times that you worked more than 30 hours a week? [Plaintiff:] . . . [y]es.").)

14

hour than the Plaintiff). (Harford Dep. 20.)

The Plaintiff, while acknowledging that Cherry's lower hourly wage would result in cost savings for the Defendant, argues that the savings equate to "a small amount." (Pl's Br. 11.) But again, it is not the Court's role "to question the wisdom of a company's decisions on how to run its business, [but] only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946–47 (7th Cir. 2006). Even employment decisions that are "mistaken, ill-considered or foolish" are permissible "so long as the employer honestly believed those reasons." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citation and internal brackets omitted); *see also Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002) (stating that the only concern in the pretext analysis is the honesty of the employer's explanation). Moreover, this argument fails to account for the presumptive savings created by the Defendant's uniform policy of reducing the hours for *all* supervisors.

The Plaintiff also points to an inconsistency in the record; namely, that "the [B]oard and Harford each credited the other with the decision" to cut the Plaintiff's hours. (Pl's Br. 3.) When asked if he recalled whether the Board made the decision to cut the Plaintiff's hours, Harford testified, "I don't recall, but [the Board] would have most likely been the ones." (Harford Dep. 17.) In contrast, Darlinger testified that Harford made the decision after receiving budgetary guidance from the Board. (*See* Darlinger Dep. 25 ("[Plaintiff's counsel:] So the decision to reduce [the Plaintiff's] hours would have been made by Alan Harford based on what the board told him about the budget; is that correct? [Darlinger:] I believe so.").) The Court finds that the above testimony—which differs only as to the Board's level of involvement in the decision—is not so inconsistent as to render the Defendant's rationale "unworthy of credence." *Fane*, 480

15

F.3d at 541 (to establish pretext, the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could . . . infer that [the defendant] did not act for the asserted non-discriminatory reasons."); *cf Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 931–32, n.13 (7th Cir. 2001) (sufficient evidence of pretext exists when an employer multiple inaccurate explanations for the decision not to hire the plaintiff).

Relying on the same evidence, the Plaintiff also fails to show that the Defendant's decisions to change his shift, and (if true) terminate his employment, were motivated by racial animus. The record demonstrates that the Defendant sought supervisory coverage for the day shift and a portion of the afternoon shift; and the Plaintiff's refusal to work a "special shift" of 2 PM to 8 PM led to his termination. The Defendant's apparent rationale for imposing the shift change—expanded supervisory coverage—is facially legitimate and non-discriminatory. It is also supported throughout the record. The goal of expanded supervisory coverage was not only corroborated by Darlinger, Harford, and Podgorski, but the Plaintiff himself, who testified that, more than one year prior to his termination, the Board suggested the placement of either he or Harford on the afternoon shift. And more notably, the Plaintiff's immediate successors were treated no differently: each worked the afternoon shift from 4 PM to 12 AM. If anything, the Defendant's offer of a special shift of 2 PM to 8 PM suggests its willingness to accommodate the Plaintiff.

The Plaintiff again alleges the existence of conflicting testimony to show that racial animus motivated the shift change. *Compare* Harford Dep. 24 ("[Plaintiff's Counsel:] The decision to put [the Plaintiff] on the afternoon shift or the later shift, was that your decision? [Harford:] No . . . that was the [Board's]. They wanted us on different shift.") *with* Podgorski

16

Dep. 23 ("[Plaintiff's Counsel:] And was it your understanding that [Harford] had made the decision that [the Plaintiff] needed to work that special shift? [Podgorski:] Not only him. It's my understanding that the [Board] also had something to do with it.").) Again, this testimony, which only differs as to Harford's level of involvement in the decision to change the Plaintiff's shift, is not so inconsistent as to cause a reasonable jury to believe—as it must for this case to proceed past summary judgment—that the Defendant acted on the basis of the Plaintiff's race. *See Fane*, 480 F.3d at 541.

As noted earlier, the Court's inquiry is limited to whether the Defendant's adverse employment actions were guided by an improper motive. *Nawrot*, 277 F.3d 896, 906 (7th Cir. 2002) ("We have warned repeatedly that we do not sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision."). Because the Plaintiff's evidence does not create a reasonable inference that race motivated an adverse employment action, the Plaintiff's claims under Title VII and 42 U.S.C. § 1981 necessarily fail under both the direct and indirect methods of proof. Accordingly, the Defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant Lake Minnehaha Owner's Association's Motion for Summary Judgment [ECF No. 35]. The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on August 21, 2015.

s/ Theresa L. Springmann
THERESA L. SPRINGMANN
